UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VIRGIL M. PRICE,

                Plaintiff,                    Civil Action No. 2:12-cv-15209

         v.                          District Judge Lawrence P. Zatkoff
                                  Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION TO
GRANT IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [15] AND
TO DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [20]**

      Plaintiff Virgil Price was twice injured while working as a machine operator. Price maintains that his failure to adequately recover from these injuries prevents him from working a full-time job. As such, Price filed (on three separate occasions) applications for disability benefits from the Social Security Administration. After an Administrative Law Judge denied Price's third application, Price appealed here. Before the Court for a report and recommendation (Dkt. 4) are the parties' cross-motions for summary judgment (Dkts. 15, 20). For the reasons set forth below, this Court finds that the ALJ did not provide Price with "good reasons" for rejecting the opinion of Price's long-time physician who was also the only physician knowledgeable about Price's condition during a significant portion of the disability period. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 15) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (Dkt. 20) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

## I. BACKGROUND

In July 2005, a forklift driver dropped large metal pipes that rolled up on Price's legs. (Tr. 274, 284.) About two years later, Price stepped off a platform and fell while carrying metal parts. (Tr. 274.) Price says he sustained injuries to both legs and his back. (Tr. 48.) In March 2008, Price filed his second application for social security disability benefits alleging that he became disabled on November 12, 2007. (Tr. 75.) In April 2010, an Administrative Law Judge denied this application. (Tr. 75-84.) Price then filed another disability benefits application asserting that he had become disabled the day after the April 2010 denial. It is this third application that led to this appeal. And probably because Price's third application alleged a disability beginning after the April 2010 denial of his second application, the administrative record before the Court begins long after Price's 2005 and 2007 injuries: in February 2010.

On February 12, 2010, Price underwent an MRI study—apparently his first since July 2007. (Tr. 244.) The radiologist's impression was "[m]ultilevel disc desiccation, most conspicuous at L2-L3 where a broad disc protrusion narrows the central canal and contributes to bilateral lateral recess stenosis." (Tr. 244.)[1] Price also had multilevel facet arthropathy. (*Id.*) Notably, the findings were "stable" when compared to a July 2007 MRI. (*Id.*)

On February 23, 2010, Dr. Jeff Pierce, a physical medicine and rehabilitation specialist,

---

[1]The spinal column is comprised of vertebrae separated by discs that act as cushions between the vertebrae. Joseph T. Alexander, M.D., Assistant Professor of Neurosurgery for Mayo Medical School, *Lumbar Spinal Stenosis: Diagnosis and Treatment Options* at 1 (June 1999). The central canal of the spinal column conveys the spinal cord. At each disc level, e.g., C6-C7, a pair of nerves exit the canal to the arms or legs. *Id.* The "nerve root canal (lateral recess) and the intervertebral foramen (neural foramen) . . . form a tubular canal through which the nerve root exits." Kenneth Botwin, M.D. & Robert Gruber, D.O., *Lumbar Spinal Stenosis: Anatomy and Pathogenesis*, 14 Phys. Med. Rehab. Clin. N. Am. 1 (2003).

completed a questionnaire sent by the attorney prosecuting Price's second disability application. (Tr. 229-42.) Dr. Pierce noted he had been treating Price since June 2007 on a "bi-weekly [to] monthly" basis. (Tr. 229.) The physical medicine specialist provided a diagnosis of low-back pain, lumbosacral radiculopathy, facet arthrosis, herniated nucleus pulposus, stenosis, and hip pain. (*Id.*) Dr. Pierce explained that Price's treatment history included physical therapy, a home exercise program, epidural injections, and medications such as Tramadol, Flexeril and Naprosyn. (Tr. 233.) Dr. Pierce opined that Price could sit for one to two hours total during an eight-hour workday, stand or walk for "5.5" hours during a workday, and, perhaps inconsistently, sit, stand, or walk for "5.5" hours total in eight-hour day. (Tr. 237.)

On April 6, 2010, Administrative Law Judge Mary Ann Poulose, having considered the February 2010 MRI and Dr. Pierce's opinion, found that Price's "degenerative disc disease of the lumbar spine," "ankle ligament tears," and "ped cavus deformity with medial ankle pain" were not disabling. (Tr. 75-84.) In particular, she concluded that despite these impairments, Price could still perform "light work as defined in 20 CFR 404.1567(b) where he will only occasionally be required to stoop, crouch, crawl, kneel, or climb; and have the option to sit or stand at will." (Tr. 78.) Based on this residual functional capacity assessment, ALJ Poulose found that Price was capable of performing his past work as a security guard. (Tr. 82.)

Less than three weeks after ALJ Poulose's decision, Price filed the application for disability insurance benefits that led to this appeal. (Tr. 15.) In this April 23, 2010 application, Price alleged a disability onset date of April 7, 2010, the day after ALJ Poulose's decision. As detailed below, Price later amended his disability onset date to February 24, 2011, the date of his 50th birthday.

In June 2010, at the behest of an insurer providing Price with long-term disability benefits,

Price underwent a "Functional Capacity Evaluation" with Becky Kantor, a physical therapist. (Tr. 263-82.) Price informed Kantor that he had lumbar, buttock, shoulder blade, "whole leg," and ankle pain at the eight out of ten level, i.e., "severe" pain. (Tr. 265.) Price believed that he could sit for 30 minutes, stand for 20 minutes, walk for 30 minutes, and lift 20 pounds. (*Id.*) Upon what appears to have been a thorough evaluation, Kantor concluded that Price was able to function at the "Light Physical Demand Level according to the U.S. Department of Labor Standards." (Tr. 272.) This meant that Kantor thought that Price could exert up to 20 pounds of force occasionally and 10 pounds of force frequently. (Tr. 282.) Unlike the Social Security Administration's definition of "light" work, however, Kantor thought that Price could sit "frequent[ly]" but stand or walk only "occasional[ly]." *Compare* (Tr. 263), *with* 20 C.F.R. § 404.1567(b).

The next month, Dr. Atul Shah evaluated Price for Michigan's Disability Determination Service, a state agency that helps the Social Security Administration evaluate claimants. (Tr. 284-90.) As he did with Kantor, Price reported pain at the eight out of ten level. (Tr. 284.) Price told Dr. Shah that the pain went across his whole back and that he had tingling and numbness in his legs and, sometimes, his arms. (Tr. 284.) Dr. Shah concluded, "Based on today's examination, the patient has moderate to severe restrictions for occupational ability because of [his] lower back pain, neck pain, and knee and ankle pain. He has limitations for walking, standing and climbing the stairs and ladders." (Tr. 286.) Dr. Shah did not quantify these "limitations." (*See generally* Tr. 284-90.)

In October 2010, Dr. Stephen Wood reviewed Price's medical file for Michigan's Disability Determination Service. (Tr. 94-95.) He noted Dr. Shah's report, the February 2010 MRI, and Kantor's functional evaluation. (Tr. 95.) Dr. Wood adopted ALJ Poulose's residual functional capacity assessment. (Tr. 92.) Specifically, Dr. Wood opined that Price could lift 20 pounds

4

occasionally, 10 pounds frequently, stand or walk for five hours, sit for five hours, and needed to sit or stand at will. (Tr. 93.)

On May 13, 2011, Price appeared before Administrative Law Judge Daniel G. Berk to testify in support of his April 23, 2010 disability application. After considerable discussion regarding the application of res judicata due to ALJ Poulose's decision and Price's chosen disability onset date just one day after her decision, Price's counsel finally amended his client's alleged disability onset date to February 24, 2011, Price's 50th birthday:

> I will, I tell you what; I will amend to his fiftieth birthday which would be February 21, 2011. And indicate that as of that date, the law changed number one, he had to be less disabled in order to get benefits on that date. We have the report of Dr. Sha[h] that indicates that [Mr. Price's] ability to walk and stand—

(Tr. 37.)

At the hearing, Price testified that he could not perform his past work because of "back problems, leg problems." (Tr. 48.) "I can't bend, sit, stand like I used to," Price explained. (Tr. 48.) When asked how long he could stand, Price testified, "[t]wenty five [minutes] to maybe a little bit longer but I would have to try to sit down if I can." (Tr. 43.) Regarding sitting: "[a]bout the same, I mean I have to move to side to side maybe, stand up." (*Id.*) Price did testify, however, to lifting 25 pounds two or three times per week when going grocery shopping or doing his laundry. (Tr. 53-54.) Price explained, "I catch the bus so I would say about an hour I have to carry my groceries home on the bus." (Tr. 54.) This, however, resulted in soreness and fatigue in Price's "[a]nkles, legs, knees, back, hips, [and] neck." (Tr. 54.) Price also testified to ongoing problems with his ankles, including swelling that required him to elevate his legs to "[h]eart level." (Tr. 49.) When asked how long he needed to elevate his legs, Price responded: "[t]wo to three hours." (*Id.*) Price further

2:12-cv-15209-SFC-LJM   Doc # 21   Filed 11/07/13   Pg 6 of 22   Pg ID 442

testified that he might spend half the day or "all day" lying down. (Tr. 53.)

Price's counsel attempted to question Price about how his condition had evolved since ALJ Poulose's decision. Counsel first asked Price if his ankle swelling or pain had changed since the April 2010 decision. (Tr. 50.) Price responded, "No, they're worsened I mean but I guess I can't do anything about this problem I have." (*Id.*) The ALJ then asked Price how long he had been elevating his ankles in the manner described; Price answered, "ever since July 21, 2005 when I got injured on the job." (Tr. 50.) Perhaps because of this interruption, Price's counsel got slightly off track: instead of asking about how Price's condition evolved since ALJ Poulose's decision, he asked whether Price needed to elevate his ankles more frequently "since July 2005"; Price acknowledged that he needed to. (Tr. 50.) Price also provided that he had been elevating his feet for a longer period of time. (Tr. 51.) It appears, however, that this was not due to his ankle condition worsening: "Well it become longer because I'm no longer working. I used to have to work on my ankles when they were swollen and sore." (Tr. 51.)

Counsel next asked about Price's back pain "since 2005." (Tr. 51.) Price responded, "Worsened." (*Id.*) Counsel, returning to the relevant time period, then asked Price about his lower-back pain since his "fiftieth birthday"; Price responded, "Eight through 10. . . . I have pain consistently in my back, all the time." (Tr. 51.)

Price also testified that his knees had "gotten worser" since he had stopped working. (Tr. 52.) He described his knee pain as an "[e]ight through ten." (*Id.*)

Later in the hearing, ALJ Berk sought to clarify when Price began experiencing the back and knee pain that he had testified to. When asked how long he had been experiencing back pain at the eight out of ten level, Price responded, "Since about 2007." (Tr. 59.) As for Price's knee pain:

6

> [ALJ:] And how long have you[r] knees been at that level?
>
> [PRICE:] My knees, they was giving out on me after I had that accident in 2005. You know, I would have back pain but showering you know, I use an ointment called Icy Hot; it would help a little bit. But back in May 2007, I had an injury with my back. I've never been right since that injury.

(Tr. 59.) Upon reexamination by Price's counsel, Price apparently testified that the severity of his back and knee pain had remained the same since the time of his initial injuries but that the pain had become more frequent:

> Q The Judge just asked you since what time period has your back pain, knee pain been at the eight to 10 level. The frequency of that pain at the eight to 10 level, has it been the same, have you had pain at that level more frequently or less frequently?
>
> A After 2007, more frequently, I was having pain in my knees and ankles in 2005 after I encountered an accident, an injury.
>
> Q Okay, that's when it started at that level, correct?
>
> A Yes.

(Tr. 60.)

Following Price's testimony, the ALJ asked a vocational expert about whether jobs would be available for someone of Price's age, education, and work experience who was able to lift 25 pounds frequently but needed to be able to sit or stand at will. (Tr. 63-65.) The expert testified that such an individual could perform "a limited range of light, unskilled work," including inspector, small products assembler, and a sorter or packer. (Tr. 64.)

Within an hour of the hearing, Price's counsel faxed Dr. Pierce a letter. (Tr. 328-30.) The letter informed Dr. Pierce that Price had testified to experiencing pain at an eight to ten level since his "original injuries," but "since having his injuries the frequency and duration of his pain in his

back, hips, legs, knees, ankles, and feet have increased to the degree that his pain and swelling occur more often and that his symptoms of pain and swelling last for longer periods of time." (Tr. 328.) The letter then asked Dr. Pierce to answer three questions. (Tr. 328-30.)

On May 24, 2011, Dr. Pierce responded. (Tr. 326-27.) To the letter's first question—"Based upon Mr. Price's histories over the years, your medical findings, and any objective medical testing, is it your opinion that Mr. Price is accurately describing his pain and swelling as staying the same in intensity but increasing in duration and frequency?" (Tr. 328)—Dr. Pierce answered, "Yes. His testing is accurate." (Tr. 326.) The letter's second question read: "As of Mr. Price's 50th birthday on February 24, 2011, had there been significant worsening of his medical condition when comparing his medical condition to what it was on April 6, 2010?" (Tr. 329.) Dr. Pierce responded: "Yes, there was significant worsening of his medical condition from April 6, 2010, for at least his 50th birthday on February 24, 2011, with increased intensity, duration, and lack of improvement. The patient has had lack of ability for treatment. . . . My answer is with reasonable degree of medical certainty, the patient has continued to worsen over this timeframe." (Tr. 326.) The letter's third question asked Dr. Pierce "whether or not Mr. Price was capable of performing a full-time job, 8 hours a day, 40 hours a week, where that job would require him to lift up to 10 pounds frequently and up to 25 pounds infrequently, and that he could perform that job either sitting or standing at will." (Tr. 329.) The question continued by informing Dr. Pierce of the typical breaks allowed at the typical job, reminded Dr. Pierce that the job would be "8 hours a day, 40 hours a week, 50 weeks a year," and then asked, "do you have a medical opinion to a reasonable degree of medical certainty as to whether or not Mr. Price would be able to perform this restricted job on a full time basis as of his 50th birthday on February 24, 2011?" (Tr. 329.) Dr. Pierce replied: "I feel at this time, Mr. Price

8

would not be able to perform his full-time job with his current condition." (Tr. 326.) He then

expanded this opinion:

> The patient has ongoing history, ongoing medical examination,
> ongoing discomfort, and ability to relieve his back pain. The patient
> continues to have ranging from 7 to 9 severe low back pain on a scale
> of 10, 10 being the worse. The patient has had MRIs in the past and
> injections in the past. The patient has not been able to get updated
> MRI testing and EMG testing because of insurance issues. He has
> been able to get significant physical therapy. I feel at this time he
> would only be able to manage his pain levels, hopefully reducing his
> baseline of pain, but overall, I do not feel the patient could participate
> in full-time employment as described above. The patient's last MRI
> dated February 12, 2010, shows multilevel disc most consistent with
> L2-L3 broad disc protrusion narrowing the central canal and
> contributes to bilateral lateral recess stenosis at L4-L5 with facet
> arthropathy, L5-S1 with facet arthropathy, ligamentum flavum
> hypertrophy, broad disc space without canal or foraminal stenosis. At
> L5-S1, there was facet arthropathy, midline disc protrusion with
> anterior thecal effacement. In summary through his medical
> condition, history, physical exam, followup visit, objective testing,
> I feel at this time Mr. Price is disabled from any type of full-time
> employment as described.

(Tr. 327.)

Having received and considered this opinion, reviewed the remainder of the administrative

record, and heard Price's testimony, ALJ Berk determined that Price had not been disabled since

February 24, 2011. (Tr. 26.) At step one of the five-step process for determining disability, *see*

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997), ALJ Berk found that Plaintiff

had not engaged in substantial gainful activity since the (amended) alleged disability onset date of

February 24, 2011. (Tr. 17.) At step two, the ALJ found that Price suffered from the following

"severe" impairments: "degenerative disc disease of the lumbar spine, a history of ankle ligament

tears, and a pes cavus deformity with medial ankle pain." (*Id.*) Proceeding to step three, the ALJ

concluded that none of these impairments, alone or in combination, met or medically equaled any

of the Administration's "listed" impairments found at 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 18.) Between steps three and four, the ALJ assessed Price's ability to function despite his impairments: "the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b). More specifically, the claimant can lift up to 25 pounds on a frequent basis, but must be allowed to change his position from sitting to standing at will." (Tr. 18.) Relying on the vocational expert's testimony at the hearing, ALJ Berk next concluded that Price was "unable to perform any [of his] past relevant work." (Tr. 24.) At step five, again relying on the vocational expert's testimony, the ALJ concluded that jobs in substantial numbers existed for someone of Price's age, education, experience, and residual functional capacity. (Tr. 25.) ALJ Berk thus concluded that Price was not "under a disability, as defined in the Social Security Act, from February 25, 2011, through the date of this decision," July 8, 2011. (Tr. 26.)

ALJ Berk's disability determination became the final decision of Defendant Commissioner of Social Security when the Social Security Administration's Appeals Council denied Price's request to review ALJ Berk's decision. (Tr. 1.) This appeal followed. (Dkt. 1, Compl.)

**II. STANDARD OF REVIEW**

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it

is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## III. ANALYSIS

ALJ Berk was bound to adopt Poulose's residual functional capacity assessment and disability conclusion "absent changed circumstances." *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 842 (6th Cir. 1997) ("We reject the Commissioner's contention that the Social Security

11

Administration has unfettered discretion to reexamine issues previously determined absent new and additional evidence."). Applying *Drummond*, courts have held, and the Court accepts as established for purposes of this case, that to avoid the preclusive effect of a prior ALJ decision, the claimant must produce not only new and material evidence, but that evidence must also show that the claimant's condition worsened since the prior decision. *E.g.*, *Drogowski v. Comm'r of Soc. Sec.*, No. 10-12080, 2011 WL 4502988, at *8 (E.D. Mich. July 12, 2011) ("Plaintiff misapprehends the scope of [the *Drummond*] test. Plaintiff must not merely present new and material evidence, but that evidence must show that plaintiff's condition deteriorated from the state of her condition at the time the ALJ made the decision."), *report and recommendation adopted*, 2011 WL 4502955 (E.D. Mich. Sept. 28, 2011); *Makinson v. Colvin*, No. 5:12CV2643, 2013 WL 4012773, at *5 (N.D. Ohio Aug. 6, 2013) ("In order to avoid the application of *Drummond*, a claimant must present evidence showing that her symptoms have changed since the time of the Commissioner's prior determination.").

In adjudicating Price's case, ALJ Berk recognized the rule of *Drummond*: "The findings and conclusions of Judge Poulose regarding the claimant's ability to perform work related activities until the date of her decision is subject to the doctrine of res judicata. Furthermore, the undersigned noted under the Acquiesce Ruling [98-4(6) 1998 WL 283902 (June 1, 1998),] . . . adjudicators are to adopt the finding from a final decision of an Administrative Law Judge unless new and additional evidence provides a basis for a different finding of the claimant's residual functional capacity." (Tr. 20.) The ALJ then concluded that the administrative record supported its application: "The undersigned's review of the objective findings in the claimant's newly proffered medical evidence failed to establish any significant worsening in claimant's impairments since the time of Judge Poulose's

12

decision." (Tr. 20.)

Central to ALJ Berk's conclusion is a subsidiary finding that Price challenges on appeal. In particular, in determining that the record before him failed to establish that Price's impairments had significantly worsened, the ALJ discredited Dr. Pierce's May 2011 opinion to the contrary. As recounted in detail above, Dr. Pierce thought that Price's condition had "significant[ly]" worsened "from April 6, 2010, for at least his 50th birthday on February 24, 2011, with increased intensity, duration, and lack of improvement." (Tr. 36.) Yet, the ALJ gave this opinion "limited probative weight." (Tr. 23.) The Court believes that each of the ALJ's three explicit rationales for discounting Dr. Pierce's treating opinion are suspect, and, as a whole, the ALJ's narrative fails to adequately articulate why he so severely discounted the opinion of Price's long-time physician.

Under the treating source rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting former 20 C.F.R. § 404.1527(d)(2) now § 404.1527(c)(2)); *see also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). And where an ALJ finds that a treating physician's opinion is not entitled to "controlling weight," there remains a rebuttable presumption that the opinion is entitled to "great deference." *Rogers*, 486 F.3d at 242; *see also* Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *4.

Related to this last point, and critical for present purposes, is the explanatory aspect of the treating-source rule: an ALJ must provide "good reasons," supported by substantial evidence, for the weight assigned to a treating-source opinion. *See Gayheart*, 710 F.3d at 376; *Rogers*, 486 F.3d at 243; *Wilson*, 378 F.3d at 544. A claimant's procedural right to an adequate explanation is

13

substantial: abridgement warrants remand even when substantial evidence supports the ALJ's decision to reject a treating-source opinion. *See Rogers*, 486 F.3d at 243 ("Because of the significance of the notice requirement in ensuring that each denied claimant receives fair process, a failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.").

The ALJ gave three explicit reasons for discounting Dr. Pierce's May 2011 opinion about Price's deteriorating condition. None are "good reasons."

*First*, the ALJ reasoned that Dr. Pierce opined on an issue reserved to the Administration. (Tr. 23; *see also* Def.'s Mot. Summ. J. at 13.) To be sure, an opinion that a claimant is "disab[led]" under the Social Security Act is informed not only by medical findings but also by vocational and legal requirements. As such, a treating source's opinion to that effect is not entitled to any special deference. 20 C.F.R. § 404.1527(d)(1) ("We are responsible for making the determination or decision about whether you meet the statutory definition of disability."). Dr. Pierce, however, did not opine that Price was "disabled"; he instead thought that Price was "disabled from any type of full-time employment *as described*." (Tr. 327 (emphasis added).) The emphasized language is important. It refers to a job with specific functional demands: lifting 10 pounds frequently, 25 pounds infrequently, and a sit/stand option. (Tr. 326.) As such, Dr. Pierce considered specific functional demands—lifting 10 pounds for up to two-thirds of an eight-hour day but with the option of sitting or standing at any time—and opined that Price was not capable of meeting those demands on a full-time basis. This is not the same thing as opining that Price was "disabled" or "unable to

14

work." *Cf.* 20 C.F.R. § 404.1527(d)(1).

*Second*, the ALJ said, "Dr. Pierce's opinion that the claimant's condition continued to deteriorate was generally inconsistent with the objective findings in his treatment notes . . . ." (Tr. 23.) Earlier in his narrative, the ALJ expanded on this point by asserting that Dr. Pierce's "physical examination findings were generally unremarkable outside of decreased range of motion in his lumbar spine," that "straight leg raise test[s] were generally negative," and that "there was no indication that Dr. Pierce recommended the claimant seek additional treatment from an orthopedic surgeon." (Tr. 20.)

Substantial evidence does not support these three subsidiary findings. As to the first, Dr. Pierce's exam findings were not "generally unremarkable outside of decreased range of motion in his lumbar spine." In his monthly treatment notes from June 2010 through February 2011, Dr. Pierce consistently noted that upon "inspection" two (and often three) of Price's posture, gait, alignment, muscle tone, and swelling had worsened. (Tr. 317, 319-325.) The Court also adds that Dr. Pierce's "palpation" findings from June 2010 through February 2011 exams consistently show "worsen[ing]" in both "trigger point" and "muscle tone." (Tr. 317-322, 324, 325.) Next, at least to the period after ALJ Poulose's decision, the ALJ's statement that Dr. Pierce's "straight leg raise testing were generally negative" lacks substantial evidentiary support. In all but one monthly exam from June 2010 through February 2011, Dr. Pierce found that, on the left, Price had a positive straight-leg raising test in both the supine and the sitting positions. (Tr. 316-320, 322-325.) Finally, although the ALJ accurately remarked that Dr. Pierce did not indicate that Price should see an orthopedic surgeon, this does not significantly undermine Dr. Pierce's May 2011 opinion in view of an additional fact. As Dr. Pierce explained, during this period Price was unable "to get updated MRI

15

testing and EMG testing because of insurance issues." (Tr. 327.) Although Price was "able to get significant physical therapy," there remains a strong inference that Dr. Pierce did not refer Price to an orthopedic surgeon because Price's "insurance issues" precluded surgery.

Given the lack of support for the ALJ's subsidiary findings, the ALJ's conclusion that Dr. Pierce's opinion was "generally inconsistent with the objective findings in his treatment notes" does not satisfy the explanatory aspect of the treating-source rule. *See Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 552 (6th Cir. 2010) ("[I]t is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick." (citation omitted)).

*Third*, the ALJ discounted Dr. Pierce's May 2011 opinion because it was "generally inconsistent with . . . the findings from the claimant's prior MRI, which demonstrated clinical stability since the time of his 2007 imaging study." (Tr. 23.) True, the later MRI results were "stable" as compared to the 2007 MRI. (Tr. 244.) But it is also true that the later MRI was performed in February 2010. (*Id.*) The ALJ failed to adequately explain how an MRI from that time significantly undermines Dr. Pierce's opinion that—after April 2010 and by February 2011—Price's condition had worsened.

Although each of the ALJ's three explicit reasons just discussed are not "good reasons," *Rogers*, 486 F.3d at 242, in other contexts, the ALJ did provide reasons that might be considered valid implicit attacks on Dr. Pierce's opinion, *see Wilson*, 378 F.3d at 547 (providing that an ALJ's failure to provide to comply with the "terms" of the reasons-giving requirement might be harmless where the ALJ complied with the "goal" of the rule); *Friend*, 375 F. App'x at 551 ("[T]he

16

procedural rule is not a procrustean bed, requiring an arbitrary conformity at all times. If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused."). Three stand out. First, the ALJ reasoned that Dr. Pierce's February 23, 2010 opinion was internally inconsistent. (Tr. 22.) In that opinion, Dr. Pierce, apparently answering a question from Price's counsel about one of the Administration's listed impairments, indicated that Price's back condition precluded his ability to sustain a reasonable walking pace over a sufficient distance to carry out normal activities of daily living. (Tr. 234-35.) Yet, in the same opinion, the ALJ noted that Dr. Pierce found that Price could "stand/walk" for five-and-a-half hours in an eight-hour day. (Tr. 23; *Compare* Tr. 234-35, *with* Tr. 237.) Additionally, Dr. Pierce's statement in a February 10, 2010 letter that Price was unable to sit or stand for "any lengths of time" is also arguably inconsistent with his February 23, 2010 opinion that Price could "stand/walk" five-and-a-half hours total in an eight-hour day. (*Compare* Tr. 237, *with* Tr. 245.) Second, in discrediting Price's complaints of debilitating pain, the ALJ asserted that Price was able to perform a considerable number of daily activities. (Tr. 23.) Most significant in this regard was the ALJ's recognition that Price "walk[ed] a considerable distance to use public transportation" and "[carried] his groceries, weighing up to twenty-five pounds, home from the grocery store." (Tr. 23.) Third is the other opinion evidence of record. Kantor's June 2010 findings that Price could sit "frequent[ly]" (up to 2/3 of the workday) and stand or walk "occasional[ly]" (up to 1/3 of the workday) is in tension with Dr. Pierce's opinion that Price could not work full-time at a job where he could split time between sitting and standing as he pleased. (*Compare* Tr. 263, 282, *with* Tr. 326-27.) Also contrary to Dr. Pierce's opinion is Dr. Wood's conclusion that Price retained the residual functional capacity set forth by ALJ Poulose.

17

(*Compare* Tr. 92, *with* Tr. 326-27.) Notably, the ALJ gave Dr. Wood's opinion "great probative weight . . . since his conclusion[s] were generally consistent with the record as a whole." (Tr. 23.)

None of these three implicit attacks are particularly strong, however. Although Dr. Pierce's February 2010 opinions were arguably inconsistent with another, and one was arguably internally inconsistent, this does not undermine Dr. Pierce's credibility so severely that it justifies giving a separate opinion, namely the May 2011 opinion, virtually no weight. *Cf. Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009) (providing that even if a treating-source opinion is not entitled to controlling weight because it is either not well supported or inconsistent with the remaining record, "'there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference'" (quoting *Rogers*, 486 F.3d at 242)). As for Price's daily activities, while he did say he carried 25 pounds of groceries for an hour, he also testified that after doing so he would feel "fatigued and sore" in his "[a]nkles, legs, knees, back, hips, [and] neck." (Tr. 54.) Further, Price only did this activity three times a week. (Tr. 53-54.) This is a far cry from lifting up to 25 pounds, for up to one-third of an eight-hour workday, for five days a week (and 50 weeks a year). *See Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons[,] . . . and is not held to a minimum standard of performance, as she would be by an employer."). As for the other opinion evidence, the Court notes that Kantor, unlike Dr. Pierce, saw Price only once and was not an "acceptable medical" source. *See* SSR 06-03p, 2006 WL 2329939, at *5 (providing that "[t]he fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical

source' because, as we previously indicated in the preamble to our regulations at 65 FR 34955, dated June 1, 2000, 'acceptable medical sources' 'are the most qualified health care professionals.'"). Morever, the ALJ never explained what weight he gave to her opinion. (*See* Tr. 22.) Instead, he ambiguously stated that he "considered" her observations. (Tr. 22.) As for Dr. Wood, he was an acceptable medical source, but not of the particularly persuasive variety: he never saw Price in person and only reviewed the assessments of others. *See* SSR 96-6p, 1996 WL 374180, at *2 ("The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker. For example, the opinions of physicians or psychologists who do not have a treatment relationship with the individual are weighed by stricter standards, based to a greater degree on medical evidence, qualifications, and explanations for the opinions, than are required of treating sources."); *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009) ("Nothing in the regulations indicates, or even suggests, that the administrative judge may decline to give the treating physician's medical opinion less than controlling weight simply because another physician has reached a contrary conclusion."). The Court adds that Dr. Shah's opinion could support either Dr. Wood or Dr. Pierce; he merely opined, without quantification, that Price had "moderate to severe restrictions for occupational ability." (Tr. 286.)

Perhaps most strongly supporting remand, however, is that Dr. Pierce was the only health-care professional—acceptable medical source or otherwise—that was knowledgeable about Price's condition after Price was evaluated by Dr. Shah in July 2010. As noted at the outset, the central issue before the ALJ was Price's condition after ALJ Poulose's decision in April 2010. Dr. Pierce, who saw Price at least ten times after her decision, was the person in the best position to provide an answer to this question.

19

This is not to say that a remand for benefits is proper. *See Faucher v. Sec'y of Health & Hum. Servs.*, 17 F.3d 171, 176 (6th Cir. 1994) ("If a court determines that substantial evidence does not support the Secretary's decision, the court can reverse the decision and immediately award benefits only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits."). Instead, what is necessary is for an ALJ to reevaluate Dr. Pierce's opinion in light of the above analysis. There may be valid reasons, capable of explicit articulation, for discrediting his May 2010 opinion. The ALJ's present narrative, however, does not provide those reasons with that level of articulation. *Sawdy v. Comm'r of Soc. Sec.*, 436 F. App'x 551, 553 (6th Cir. 2011) ("When an ALJ violates the treating-source rule, '[w]e do not hesitate to remand,' and 'we will continue remanding when we encounter opinions from ALJ[s] that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion.'" (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009))); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009) ("Even assuming arguendo that the ALJ correctly reached her determination that [the treating source] should be discredited, the ALJ's summary rejection of [the treating source] without explaining the weight given his opinions falls short of the Agency's own procedural requirements . . . ."); *Rogers*, 486 F.3d at 243 ("[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." (emphasis added)).

## IV. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court finds that the ALJ did not provide Price with "good reasons" for rejecting the opinion of Price's long-time physician who was also the only

physician knowledgeable about Price's condition during a significant portion of the disability period. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 15) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (Dkt. 20) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

## V. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson            
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  November 7, 2013

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on November 7, 2013.

s/Jane Johnson
Deputy Clerk